**THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| MINDY CAPLAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Case No. 14-1021 |
| | ) | |
| L BRANDS/VICTORIA'S SECRET | ) | |
| STORES, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION

CONTI, Chief United States District Judge

### I.    INTRODUCTION

This dispute arises out of the termination of the employment of Mindy Caplan ("Caplan" or "plaintiff") by her employer, L Brands/Victoria's Secret Stores, LLC ("VSS" or "defendant"). At the time of her termination, Caplan was a VSS district manager.  Caplan claims that VSS terminated her employment in retaliation for needing and taking time off work to attend to the medical needs of her child and herself and for opposing racial discrimination in society.  Caplan also accuses VSS of interfering with her right to take medical leave under federal law. According to Caplan, VSS's conduct violated 42 U.S.C. § 1981 ("§ 1981") and the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601 et seq. ("FMLA"). (ECF No. 1.)   This court exercises subject-matter jurisdiction over plaintiff's claims pursuant to 28 U.S.C. § 1331.

Pending before the court is VSS's motion for summary judgment. (ECF No. 28.)  In that motion, VSS seeks entry of judgment as a matter of law with respect to all claims asserted in Caplan's complaint.  For the reasons that follow, VSS's motion will be granted, judgment will be entered in VSS's favor on all three claims set forth in the complaint, and this case will be closed.

II.   **FACTUAL AND PROCEDURAL BACKGROUND**

A.  **Caplan's Employment with VSS**

VSS is a nationwide specialty retailer. (Combined Concise Statement of Material Facts (ECF No. 41) ("C.S.") ¶ D1).[1]   Each VSS store is headed by a store manager. (C.S. ¶ D2.) Stores are organized into geographical districts, and each district is supervised by a district manager. (C.S.¶ D3.)  The district manager is supervised by a regional manager. (C.S. ¶ D3.) Caplan was hired by VSS in 2001 as a district manager and was responsible for overseeing eight or nine stores in the Pittsburgh, Pennsylvania, area. (C.S. ¶¶ D7-8.)  During the relevant time period, Caplan's supervisor was regional manager Laura Courtney ("Courtney"). (C.S. ¶ D9.) Caplan's duties as district manager included knowing, enforcing, and abiding by VSS's policies; plaintiff was aware that she could be terminated for violating a VSS policy.  (C.S. ¶ D13.) Courtney considered Caplan to exhibit "good work performance" while employed as a district manager. (C.S. ¶ P3.)

Caplan utilized FMLA leave on three occasions between 2010 and 2012. (C.S. ¶ D65.) All three times, Caplan followed VSS's procedure when requesting FMLA leave. (C.S. ¶ D65.) VSS's benefits guide directs employees to contact HR Direct, a service that administers FMLA leave for VSS, to coordinate FMLA leave. (C.S. ¶¶ D6, D63.)  VSS procedure requires employees to take the following steps when requesting FMLA leave: "(1) contact HR Direct to request a FMLA packet; (2) return the completed forms to HR Direct; and (3) include a written medical certification from a healthcare provider." (C.S. ¶ D64.)  Caplan was granted FMLA

_____

[1] The Combined Concise Statement of Material Facts ("C.S."), first recites defendant's statement of facts, and then recites plaintiff's statement of facts, with the corresponding responses of the opposing party.  The court will delineate between these two statements with the format C.S. ¶ D3, to signify a statement of fact originally proffered by VSS, ECF No. 41 at 1-28, and C.S. ¶ P3, to signify a statement of fact originally proffered by Caplan, ECF No. 41 at 29-55.

leave each time and there is no evidence that her supervisor expressed any objection to or problem with her needing to take this time off. (C.S. ¶¶ D67, D74.)

After 2012, Caplan never again contacted HR Direct to request FMLA leave. (C.S. ¶ D68.)  Caplan did request paid time off ("PTO") in April, May, and June 2014 for health reasons including kidney stones, gall stones, and an ovarian cyst, and to care for her son after he suffered a serious wrist fracture and had his appendix removed. (C.S. ¶ D69, ¶ P97.)  These medical issues were each unexpected.  The record reflects that Caplan's requests for PTO were typically made on the morning of or the night before the day that she needed to take off. (e.g., ECF No. 38-3 at 1, 3, 4, 5, 7, 14.)  In order to take PTO, Caplan was required to contact her immediate supervisor, Courtney, and seek permission or approval for the time off. (C.S. ¶ D70.)  Caplan requested extensions for some of these absences when certain medical concerns continued, and Courtney granted those extensions. (C.S. ¶¶ P92-100, P102-05, P110).  Caplan asserts that Courtney "warned her" about requesting leave during a busy sales period for VSS, but there is no dispute that Caplan was granted all the PTO that she requested between April and June 2014. (C.S. ¶ D71, ¶¶ P106-09.)  Caplan's last PTO day was on or around June 9, 2014. (C.S. ¶ P123.)

Caplan and Courtney communicated while Caplan was taking PTO, about both personal matters, e.g., Caplan's son's and her own health, and business matters, e.g., whether Caplan would be able to participate in meetings by telephone and about regional sales data. (C.S. ¶¶ P93-100, P102, P105, P110.)  While Caplan was on PTO in May 2014, she was included on a group email that Courtney sent to the district managers in her region, which email attached a company report and expressed disappointment that Courtney's region was at the bottom of the "AOS participation report." (C.S. ¶ P101; ECF No. 38-3 at 9-13.)  Caplan recognized that her

district was not performing at the same level as Courtney's other districts in the region when she returned from PTO in June 2014. (C.S. ¶ P112.)

**B.  The Ethics Complaint**

Throughout 2014, Caplan used her Facebook account on a daily basis, and she identified herself as a VSS district manager and included a picture of herself in front of a VSS store on her Facebook profile. (C.S. ¶¶ D23-25.)  Caplan's Facebook profile was accessible to at least 80 other Facebook users, including other VSS employees, and was a publically accessible account. (C.S. ¶ D26.)

VSS provides its employees with an "Ethics Hotline," which allows for reporting workplace concerns via telephone – anonymously, if desired – to a third-party operator instead of to a manager or human resources representative. (C.S. ¶ D16.)  During the evening hours of June 17, 2014, VSS received an anonymous ethics complaint about Caplan that mentioned, among other things, the existence of two "disturbing" posts from Caplan's Facebook profile. (C.S. ¶ D28.)  The ethics complaint also included accusations that Caplan made racist and derogatory remarks while on the job, and refused to hire or promote African-American candidates. (C.S. ¶ D28,      ¶ P6.)  This was the first complaint of this nature that VSS received about Caplan. (C.S. ¶¶ P10-11.)

On June 18, 2014, senior human resources generalist Laura Martinez ("Martinez") and human resources director Cassandra McBride ("McBride") received and investigated the ethics complaint against Caplan.  (C.S. ¶¶ D29-30.)  Martinez and McBride located the two Facebook posts identified in the ethics complaint: the first was a reposted picture depicting a person wearing a Ku Klux Klan-reminiscent white, hooded robe emblazoned with the Los Angeles Clippers logo and the number 42, and was captioned "Game 5 in LA is Free Sheet

Night…Donald Sterling Bobble head doll night too!;" the second was a reposted picture of an African-American female named "Airwrecka McBride" appearing on a local newscast, with a caption stating "I've been spelling Erica wrong my whole life." (C.S. ¶¶ D30-32; ECF No. 30-1 at 124, 126.)  Martinez and McBride contacted Rob Stalter ("Stalter"), a member of the VSS legal department, and Stalter informed VSS general counsel Doug Williams ("Williams") about the situation. (C.S. ¶¶ D33-34.)  After reviewing the posts on Caplan's Facebook profile, Williams – an African-American male – concluded that the posts were offensive and violated VSS equal opportunity[2], off duty conduct[3], and social media[4] policies.  (C.S. ¶¶ D36-38.)

---

[2] The equal opportunity policy provides:

> We are an equal opportunity employer and it is the duty and responsibility of every associate to create and maintain an environment free of illegal discriminatory acts or behavior.  It is our policy to recruit, hire, train, promote, assign, compensate and in all ways treat persons in compliance with all applicable laws and without regard to race, color, religion, gender, gender identity, national origin, citizenship, age, disability, sexual orientation, marital status or any other prohibited ground of discrimination under applicable law.

(ECF No. 30-1 at 114.)

[3] The off duty conduct policy provides, in pertinent part:

> While the company respects your privacy, illegal activities or any conduct that will, or is reasonably likely to have, a negative effect on the company might be the subject of disciplinary action up to and including termination even if that conduct occurs off the property or off the clock.

(ECF No. 30-1 at 115.)

[4] The social media policy encourages employees to use common sense, keep confidential information confidential, be respectful and ethical, interact responsibly with company sponsored social media, redirect media inquiries, and be safe.  (ECF No. 30-1 at 116).  With respect to ethics, the policy specifies that employees should "be aware of the impact you can have and…[b]e thoughtful when discussing issues where emotions run high."  (Id.)

Williams conferred with Stalter, McBride, and senior vice president of human resources Jackie Sheets ("Sheets") regarding the two posts on Caplan's Facebook profile on June 18, 2014. (C.S. ¶ D40.) They were all concerned that the posts could reflect poorly on VSS because Caplan's profile identified her as VSS manager. (C.S. ¶ D44.) It was agreed among these four individuals that if Caplan admitted to adding either of the posts to her Facebook profile or to making any of the racist remarks identified in the ethics complaint, she would be terminated. (C.S. ¶¶ D42, D46-47.) The final decisionmaker with respect to Caplan's termination, Williams, deemed either Facebook post to be sufficient, standing alone, to warrant termination; a decision with which Stalter, Sheets, and McBride agreed. (C.S. ¶¶ D42, D46-47.) Stalter relayed the decision to Martinez, and asked Martinez to arrange an interview with Caplan. (C.S. ¶ D49.) At this point, Martinez and McBride informed Caplan's immediate supervisor, Courtney, about the ethics complaint and Williams' decision, and Martinez and Courtney scheduled a meeting with Caplan for June 20, 2014. (C.S. ¶¶ D50-52.)

Martinez and Courtney actually met with Caplan on the evening of June 19, 2014, and explained that an ethics complaint about her had been received on the VSS Ethics Hotline. (C.S. ¶¶ D52-53, ¶ P13.) During the meeting, Caplan admitted to reposting the two Facebook posts mentioned in the ethics complaint, but denied making the racist remarks. (C.S. ¶¶ D54, D56, ¶ P14.) Martinez informed Caplan that her employment was being terminated, but told her that a severance package would be made available to her. (C.S. ¶ D61.) Caplan declined to accept the severance package. (C.S. ¶ D61, ¶ P82.) Caplan identifies no evidence that Williams, Stalter, Sheets, or McBride – the four individuals who conferred about the ethics complaint and decided to terminate Caplan's employment – had any knowledge about Caplan's requests to take time off in 2014, about Caplan actually taking PTO in 2014, about her possible need to take more time

off in 2014, or about her son's or her medical conditions in 2014. (C.S. ¶¶ D41, D76-77.)  All

four individuals deny that they were aware that Caplan took PTO in 2014. (C.S. ¶ D77.)

### C.  The Instant Lawsuit

On July 20, 2014, Caplan filed a complaint in this court alleging that she had been

terminated in violation of § 1981 and the FMLA.  In Count I, Caplan contends that her Facebook

posts were intended to protest racial discrimination by society, in general, as well as by the

owner of the Clippers professional basketball team, Donald Sterling, and that her termination in

retaliation for making the posts violated § 1981. (ECF No. 1 at 3-4.)  In Count II, Caplan

contends that VSS interfered with her right to utilize FMLA leave. (Id. at 5-6.)  In Count III,

Caplan asserts that she was terminated in retaliation for actually taking or expressing a need to

take FMLA-qualifying time off work due to her son's and her own various health conditions. (Id.

at 6-7.)

VSS filed the present motion for summary judgment seeking entry of judgment as a

matter of law on all claims asserted by Caplan. (ECF No. 28.)  The issues are fully briefed and

the motion is ripe for disposition. (ECF Nos. 29-31, 35-41.)

## III.  STANDARD OF REVIEW

Summary judgment is appropriate if the record shows that there is no genuine dispute

with respect to any material fact and the movant is entitled to judgment as a matter of law.  FED.

R. CIV. P. 56(a).  The mere existence of a factual dispute, however, will not necessarily defeat a

motion for summary judgment. Only a dispute over a material fact—that is, a fact that would

affect the outcome of the suit under the governing substantive law—will preclude the entry of

summary judgment. Anderson v. Liberty Lobby, Inc.. 477 U.S. 242, 248 (1986).  Even then, the

dispute over the material fact must be genuine, such that a reasonable jury could resolve it in the nonmoving party's favor. Id. at 248-49.

In deciding a summary judgment motion, a court must view the facts in the light most favorable to the nonmoving party and must draw all reasonable inferences, and resolve all doubts, in favor of the nonmoving party. Id. at 255; Wishkin v. Potter, 476 F.3d 180, 184 (3d Cir. 2007); Woodside v. Sch. Dist. of Phila. Bd. of Educ., 248 F.3d 129, 130 (3d Cir. 2001); Doe v. Cty. of Centre, Pa., 242 F.3d 437, 446 (3d Cir. 2001); Heller v. Shaw Indus., Inc., 167 F.3d 146, 151 (3d Cir. 1999). A court must not engage in credibility determinations at the summary judgment stage. Simpson v. Kay Jewelers, Div. of Sterling, Inc., 142 F.3d 639, 643 n.3 (3d Cir. 1998).

One of the principal purposes of summary judgment is to isolate and dispose of factually unsupported claims or defenses. Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986). The summary judgment inquiry asks whether there is a need for trial – "whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Liberty Lobby, 477 U.S. at 250. In ruling on a motion for summary judgment, the court's function is not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150-51 (2000) (citing decisions); Liberty Lobby, 477 U.S. at 248-49.

The burden of showing that no genuine issue of material fact exists rests initially on the party moving for summary judgment. Celotex, 477 U.S. at 323; Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1080 (3d Cir. 1996). The moving party may satisfy its burden either by producing evidence showing the absence of a genuine issue of material fact or by demonstrating that there is an absence of evidence to support the nonmoving party's case. Marten v. Godwin, 499 F.3d 290, 295 (3d Cir. 2007) (citing Celotex, 477 U.S. at 325). A defendant who moves for summary judgment is not required to refute every essential element of the plaintiff's claim; rather, the defendant must only point out the absence or insufficiency of plaintiff's evidence offered in support of one or more of those elements. Celotex, 477 U.S. at 322-23. Once the movant meets that burden, the burden shifts to the nonmoving party to set forth specific facts showing that there is a genuine issue for trial and to present sufficient evidence demonstrating that there is indeed a genuine and material factual dispute for a jury to decide. Liberty Lobby, 477 U.S. at 247-48; Celotex, 477 U.S. at 323-25. If the evidence the nonmovant produces is "merely colorable, or is not significantly probative," the moving party is entitled to judgment as a matter of law. Liberty Lobby, 477 U.S. at 249.

The nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). To survive summary judgment, the nonmoving party must "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. Furthermore, "[w]hen opposing summary judgment, the non-movant may not rest upon mere allegations, but rather must 'identify those facts of record which would contradict the facts identified by the movant.'"

Corliss v. Varner, 247 F.App'x 353, 354 (3d Cir. 2007) (quoting Port Auth. of N.Y. and N.J. v. Affiliated FM Ins. Co., 311 F.3d 226, 233 (3d Cir. 2002)).

IV.    **DISCUSSION**

A.  **§ 1981 Claim (Count I)**

42 U.S.C. § 1981 was enacted to deter racial discrimination in the formation and enforcement of contracts. Brown v. Philip Morris, Inc., 250 F.3d 789, 796-97 (3d Cir. 2001). It also provides protection to those denouncing racial discrimination in the formation and enforcement of contracts. Untracht v. Fikri, 454 F.Supp.2d 289, 326 (W.D. Pa. 2006). Specifically, § 1981 states in its entirety:

> **(a) Statement of equal rights**
> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.
>
> **(b) "Make and enforce contracts" defined**
> For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.
>
> **(c) Protection against impairment**
> The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

42 U.S.C. § 1981. In Count I of her complaint, Caplan contends that VSS retaliated against her for publicly opposing racial discrimination by society, in general, and specifically by Donald Sterling.

The burden-shifting framework established in <u>McDonnell Douglas Corporation v. Green</u>, 411 U.S. 792 (1973), for cases arising under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq.*, applies to claims arising under § 1981. <u>Est. of Oliva ex rel. McHugh v. State of N.J.</u>, 604 F.3d 788, 798 n.14 (3d Cir. 2010); <u>Ilori v. Carnegie Mellon Univ.</u>, 742 F.Supp.2d 734, 758-65 (W.D. Pa. 2010). First, a claimant must establish a <u>prima facie</u> case of retaliation pursuant to § 1981 by demonstrating that "(1) he or she engaged in protected activity, (2) the employer took an adverse employment action after or contemporaneous with the protected activity, and (3) a causal link exists between the protected activity and the adverse action." <u>Aguiar v. Morgan Corp.</u>, 27 F.App'x 110, 112 (3d Cir. 2002); <u>Cardenas v. Massey</u>, 269 F.3d 251, 263 (3d Cir. 2001); <u>Ilori</u>, 742 F.Supp.2d at 758 (citing decisions). Once a <u>prima facie</u> case is established, the burden shifts to the employer to "advance a legitimate non-retaliatory reason for its conduct." <u>Oliva</u>, 604 F.3d at 798 (citing <u>Moore v. City of Phila.</u>, 461 F.3d 331, 342 (3d Cir. 2006)). If the employer meets this burden, then the claimant must "show that the proffered reason was a pretext for retaliation." <u>Id.</u>

The underpinning of a § 1981 retaliation claim is that an individual was punished for opposing conduct that violates § 1981, whether that individual, or some third party, was the victim of the § 1981 violation. <u>CBOCS W., Inc. v. Humphries</u>, 553 U.S. 442, 452-57 (2008). Although the protections of § 1981 are not limited to race discrimination that occurs in the employment setting, the reach of the provision is not limitless; the section protects an individual's right to be free from racial discrimination with respect to the making and enforcement of contracts. <u>Id.</u> at 455; <u>see</u> <u>Domino's Pizza, Inc. v. McDonald</u>, 546 U.S. 470, 476 (2006) ("any claim brought under § 1981…must initially identify an impaired 'contractual relationship'" whether existing or prospective).

"While there is 'no hard and fast rule' regarding what constitutes protected activity, the Third Circuit has held that protected conduct includes not only formal charges of discrimination, but also 'informal protests of discriminatory employment practices, including making complaints to management, writing critical letters to customers, protesting against discrimination by industry or society in general, and expressing support for co-workers who have filed formal charges.'" Daughtry v. Family Dollar Stores, Inc., 819 F.Supp.2d 393, 404 (D. Del. 2011) (quoting Curay–Cramer v. Ursuline Acad. of Wilmington, Del., Inc., 450 F.3d 130, 135 (3d Cir. 2006)); see Ilori, 742 F.Supp.2d at 758 (citing Barber v. CSX Distrib. Serv., 68 F.3d 694, 701-02 (3d Cir. 1995)). Complaints must be specific enough to notify the employer of the particular type of discrimination being opposed, and allow the employer to discern that the employee opposes an unlawful practice. Sanchez v. SunGard Availability Services, LP, 362 F.App'x 283, 288 (3d Cir. 2010) (citing Barber, 68 F.3d at 702); Curay-Cramer, 450 F.3d at 135.

A plaintiff's intent is not dispositive, provided that plaintiff proves that she was acting under a reasonable and good faith belief that someone's § 1981-created right to be free from racial discrimination was violated. Oliva, 604 F.3d at 798; Cacciola v. Work N Gear, 23 F.Supp.3d 518, 533 (E.D. Pa. 2014). "'It is the objective message conveyed, not the subjective intent of the person sending the message, that is determinative.'" Cacciola, 23 F.Supp.3d at 533 (quoting Curay-Cramer, 450 F.3d at 137). "[I]f no reasonable person could have believed that the underlying incident complained about constituted unlawful discrimination, then the complaint is not protected." Wilkerson v. New Media Tech. Charter Sch. Inc., 522 F.3d 315, 322 (3d Cir. 2008). An "oblique reference" to or "mere mention of race" or race-based discrimination does not constitute protected opposition to violations of § 1981. Perry v. Harvey, 332 F.App'x 728, 733 (3d Cir. 2009).

In its motion for summary judgment, VSS argues that Caplan cannot prove the first element of her prima facie case. Although Caplan contends that she can show that she engaged in protected activity by proffering evidence that she intended to protest discrimination by posting the picture of a Ku Klux Klan-reminiscent hooded person on her Facebook page, as VSS correctly points out, it is not Caplan's intent that controls, but the message objectively conveyed by the picture. (ECF No. 28-1 at 13-18). No reasonable jury could find that this image objectively complained about or protested incidents of race discrimination that violate § 1981.

As an initial matter, the message being conveyed by the image is not readily apparent. (ECF No. 38-2 at 22.) Caplan submits no evidence, aside from her own subjective beliefs, about the objective meaning of and message conveyed by this image. The picture is of an unidentified person in a white, hooded robe with Clippers and NBA insignia and the number 42 on the front. The number 42 is associated with Jackie Robinson, the first African-American to play baseball in the major leagues. (C.S. ¶ P21.) The robe is readily identifiable with the Ku Klux Klan, a group commonly-associated with the persecution of and opposition to racial minorities. The insignia and the number make the front of the hooded robe appear to be a basketball player's uniform. The image, therefore, can be interpreted as implying that Clippers' players are members of the Ku Klux Klan. According to Caplan, however, the image was a parody of Donald Sterling, the Clipper's owner, who made racist comments about his players in the summer of 2014. (C.S. ¶¶ P19-20.) The text that "Game 5 in LA is Free Sheet Night…Donald Sterling Bobble head doll night too!" suggests that sheets and dolls will be distributed to fans attending the game, in the manner in which promotional items are often given away at sporting events, implying some connection between the Clippers, as an organization, and the Ku Klux Klan and Donald Sterling. Viewed in its entirety, the picture objectively draws some sort of association between the Ku

Klux Klan, Donald Sterling, the Clippers, and perhaps the Clippers' players. No message is conveyed, however, with respect to the nature of that association, whether it is favored by any or all of these groups, whether it is favored by Caplan, and whether the association is positive or negative, as a general matter. Caplan's Facebook profile makes no comment about the image and makes no statements about opposing specific acts of racial discrimination by the Clippers or Donald Sterling. Caplan reposted the image without comment.

No reasonable jury could conclude that the picture protests racial discrimination by the Clippers or Donald Sterling against entities or individuals with whom they are contracting. Although there is no dispute that a reasonable jury would associate the imagery of a white, hooded robe and a reference to white sheets with the Ku Klux Klan, the mere reference to nonspecific racial animus is insufficient to constitute protected activity under § 1981. <u>Perry</u>, 332 F.App'x at 733. No employer would be put on notice that the picture is protesting activity prohibited by § 1981. Under the circumstances, no reasonable jury could find that this post constitutes protected activity giving rise to a § 1981 retaliation claim.

The court similarly concludes that no reasonable jury could find that the picture of Airwrecka McBride, which Caplan also posted on her Facebook profile, qualifies as protected activity. Caplan does not contend that this image qualifies as protected activity, but the court examines it in the interest of completeness. (ECF No. 35 at 6, 8-9.) The post, objectively, could not be found to include any protest against specific acts of racial discrimination prohibited by § 1981. Indeed, the picture serves no purpose other than to satirize the atypical spelling of an African-American woman's name. Caplan testified that she considered the post to be funny. (C.S. ¶¶ P35-36.) Whether this picture is simply a light-hearted jab, or a tired joke concerning a racial stereotype, the court concludes that no reasonable jury could come to the conclusion that it

constitutes a protest against unlawful racial discrimination in the formation and enforcement of contracts. Under the circumstances, no reasonable jury could find that the Airwrecka post constitutes protected activity giving rise to a § 1981 retaliation claim.

For this reason, neither of the posts that Caplan made to Facebook qualify as protected activity. Caplan cannot establish the first element of a prima facie case of retaliation under § 1981 and entry of judgment as a matter of law in VSS's favor on this claim is appropriate.[5] VSS's motion for summary judgment on Count I is granted.

## B. FMLA Claims

The FMLA was enacted by Congress to "'balance the demands of the workplace with the needs of families,' and 'to entitle employees to take reasonable leave for medical reasons.'" Budhun v. Reading Hosp. and Med. Ctr., 765 F.3d 245, 251 (3d Cir. 2014) (quoting 29 U.S.C. § 2601(b)(1), (2)). Eligible employees may take up to twelve weeks of leave during any twelve month period for the following reasons:

(A) Because of the birth of a son or daughter of the employee and in order to care for such son or daughter.

(B) Because of the placement of a son or daughter with the employee for adoption or foster care.

(C) In order to care for the spouse, or a son, daughter, or parent, of the employee, if such spouse, son, daughter, or parent has a serious health condition.

(D) Because of a serious health condition that makes the employee unable to perform the functions of the position of such employee.

(E) Because of any qualifying exigency (as the Secretary shall, by regulation, determine) arising out of the fact that the spouse, or a son, daughter, or parent of the employee is on covered active duty (or has been notified of an impending call or order to covered active duty) in the Armed Forces.

---

[5] The same analysis set forth in section IV.B.2. of this opinion would apply to Caplan's § 1981 retaliation claim if the court was required to reach the third element of Caplan's prima facie case, i.e., a causal connection.

29 U.S.C. § 2612(a)(1)(A)-(E).  Any employer required by law to provide FMLA leave faces liability for attempts to interfere with the use of leave, or for retaliating against those who have used or seek to use leave in the future.  Budhun, 765 F.3d at 251 (citing 29 U.S.C. § 2615(a)(1); 29 C.F.R. § 825.220(c)); see Lupyan v. Corinthian Colleges Inc., 761 F.3d 314, 318 (3d Cir. 2014).

### 1. FMLA Interference (Count II)

In Count II of her complaint, Caplan asserts a claim for FMLA interference.  To establish interference under the FMLA, Caplan must show that she was entitled to benefits under the FMLA, but was denied the benefits.  Mascioli v. Arby's Rest. Grp., Inc., 610 F.Supp.2d 419, 429 (W.D. Pa. 2009) (citing Callison v. City of Phila., 430 F.3d 117, 119 (3d Cir. 2005)).  Liability for interference is not based upon intent, but upon the act of interference alone.  Id. at 430 (citing Callison, 430 F.3d at 120).  Thus, a plaintiff must demonstrate that "(1) [the plaintiff] was an eligible employee under the FMLA; (2) the defendant was an employer subject to the FMLA's requirements; (3) the plaintiff was entitled to FMLA leave; (4) the plaintiff gave notice to the defendant of [her] intention to take FMLA leave; and (5) the plaintiff was denied benefits to which [she] was entitled under the FMLA."  Id. at 429-30.

In its motion for summary judgment, VSS challenges Caplan's ability to prove the fourth and fifth elements of her prima facie case.  VSS notes that while Caplan used the proper channels to request – and ultimately receive – FMLA leave on three occasions between 2010 and 2012, she chose not to do so in 2014 and instead requested, and received, PTO several times between April and June 2014. (ECF No. 28-1 at 24-25).  Caplan counters that in light of the abruptness of the medical issues necessitating that she take time off work, she provided sufficient notice to VSS that she required FMLA leave. (ECF No. 35 at 19-21).  Caplan also faults VSS for failing to

adequately inform her about her FMLA rights, resulting in her inability to arrange for FMLA leave. (Id.)  The record contradicts Caplan's position.

The FMLA requires employees provide adequate notice to their employer regarding the need to take leave. Lichtenstein v. Univ. of Pittsburgh Med. Ctr., 691 F.3d 294, 303 (3d Cir. 2012) (citing 29 U.S.C. § 2612(e)(2)).  This does not mean that the employee must expressly assert, or even mention, his or her rights under the FMLA. Id. (citing 29 C.F.R. § 825.303(b)). "The 'critical test' is not whether the employee gave every necessary detail to determine if the FMLA applies, but 'how the information conveyed to the employer is reasonably interpreted.'" Id. (quoting Sarnowski v. Air Brooke Limousine, Inc., 510 F.3d 398, 402 (3d Cir. 2007)).  This test is not a formulaic or stringent standard, and the notice requirement is to be construed liberally; an employee is obligated only to "provide sufficient information for an employer to reasonably determine whether the FMLA *may* apply to the leave request." Id.  If an employer does not believe that it received sufficient information to make such a determination, it is incumbent upon the *employer* to make further inquiries. Id. (citing 29 C.F.R. § 825.303(a)).

Caplan contends that the recurrent health problems suffered by her son and her during 2014 – many of which required hospitalization – and her requests for additional days off to attend to those medical conditions on several occasions, were sufficient to put VSS on notice that she may require FMLA leave. (ECF No. 35 at 20-21).  Indeed, relevant case law suggests that this kind of information is enough to constitute notice, particularly when the medical conditions involved were abrupt in nature. Lichtenstein, 691 F.3d at 304-06 (plaintiff followed proper call-off procedure as soon as practicable and informed her employer that she was with her mother in the emergency room and would be unable to work); Sarnowski, 510 F.3d at 403 (plaintiff recently returned from a six-week absence due to coronary artery bypass surgery and informed

his employer that he may need additional monitoring and surgery due to ongoing health problems). Viewed in the light most favorable to Caplan, the court finds that a reasonable jury could conclude that Caplan gave adequate notice to VSS of her need to take FMLA leave, thus satisfying the fourth element of her prima facie FMLA interference claim.

To satisfy the fifth element of her prima facie FMLA interference claim, Caplan must demonstrate that VSS's failure to explicitly notify her of her FMLA rights deprived her of the ability to take leave to which she was entitled under the FMLA.[6] VSS argues that Caplan cannot establish this element because she was familiar with the FMLA process as a district manager, actually used that process when she took FMLA leave on three prior occasions and, therefore, undeniably knew about her right to obtain FMLA leave. (ECF No. 28-1 at 25). Additionally, according to VSS, the evidence shows that Caplan was never denied requested leave in 2014, making it impossible for Caplan to prove that she suffered any actual harm from the purported failure of VSS to notify her about her FMLA rights. (Id.).

The FMLA requires employers to inform employees of their rights under the act "'to ensure that employers allow their employees to make informed decisions about leave.'" Lupyan, 761 F.3d at 318 (quoting Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 144 (3d Cir. 2004)). Although the lack of adequate notice about FMLA rights may support a FMLA interference claim, the failure to adequately disclose an employee's FMLA rights is not enough. Id. A plaintiff must establish that she was prejudiced by her employer's omission; that the

---

[6] To the extent Caplan seeks to use her termination as proof of interference, she advances no such argument in her brief in opposition. (ECF No. 35 at 19-21). In any event, an assertion that an employer discharged an employee in order to prevent that employee from taking anticipated periods of future leave is properly analyzed as an FMLA retaliation claim, not an FMLA interference claim. Lichtenstein, 691 F.3d at 301; Stephenson v. JLG Indus., Inc., No. 09-1643, 2011 WL 1304625 at *5 (M.D. Pa. Mar. 31, 2011); Mascioli v. Arby's Rest. Grp., Inc., 610 F.Supp.2d 419, 430-31 (W.D. Pa. 2009).

omission "'render[ed] her unable to exercise the right to leave in a meaningful way, thereby causing injury.'" Id. at 318-19 (quoting Conoshenti, 364 F.3d at 143).

As an initial matter, no reasonable jury could find that Caplan was unaware of her rights under the FMLA or unable to make an informed decision about taking FMLA leave. In her deposition, Caplan testified that as a district manager she was familiar with how employees are to apply for FMLA leave at VSS. (ECF No. 30-1 at 26-27.) Her job duties included assisting subordinates in obtaining FMLA leave by "guiding them to the proper channels," i.e., HR Direct. (Id. at 27). Caplan acknowledges that she utilized these precise channels when she requested – and received – FMLA leave on three occasions between 2010 and 2012. (Id. at 28-29, 31). Despite her admitted actual knowledge about her FMLA rights and VSS's FMLA leave policies and procedures, and the undisputed fact that she took FMLA leave on multiple occasions only a few years earlier, Caplan requested PTO[7], not FMLA leave, in 2014. (Id. at 82). FMLA leave is unpaid, while PTO is paid time off of work. (C.S. ¶ D69, ¶¶ P84, P104.) No reasonable jury could conclude, based upon this record, that Caplan took PTO because she was unaware of her FMLA rights.

Even assuming for the sake of argument, that Caplan was not aware of her FMLA rights, no reasonable jury could find that Caplan was prejudiced by VSS's failure to provide notice. As an initial matter, there is no dispute that Caplan was given all the time off that she requested in 2014. (C.S. ¶ D75.) Caplan could show prejudice, however, by showing that "had she been properly informed…she could have structured her leave differently." Lupyan, 761 F.3d at 318-19 (citing Conoshenti, 364 F.3d at 145-46; Capilli v. Whitesell Constr. Co., 271 F.App'x 261, 267

---

[7] Caplan also claims that she contacted HR Direct to request three days of "emergency pay" in lieu of PTO when her son had his appendix removed in June 2014. (C.S. ¶¶ P102-04.) There is no evidence in the record about the distinction between PTO and emergency pay.

(3d Cir. 2008)).  While Caplan makes the blanket assertion that if properly informed about her FMLA rights "she would have structured her leave differently so that her job would have been protected," she does not state how she would have structured the leave, or how that restructuring would have protected her job. (C.S. ¶ P124); cf. Lupyan, 761 F.3d at 323 (plaintiff explained that she would have expedited her return to work within twelve weeks – as opposed to the eighteen she actually took – had she known her leave was covered by the FMLA).

There is no evidence in the record that any facts or circumstances surrounding Caplan's employment would have been different if her days off in 2014 were designated as FMLA leave instead of PTO.  Based upon the record, and Caplan's arguments in opposition to summary judgment, she would have to prove that if her time off work was designated as FMLA leave, instead of PTO, Williams would not have decided to terminate her if she admitted that she was responsible for the Facebook posts.  Caplan proffers no evidence in support of such a finding. The record contradicts such a finding because it is undisputed that Williams, Stalter, McBride, and Sheets were not aware that Caplan took time off work in 2014, regardless how it was classified. (C.S. ¶¶ D76-77.)

In any event, Caplan's theory is not that Williams terminated her because she took PTO rather than FMLA leave, but, instead, that she was terminated because Courtney believed that the performance of Caplan's stores was being adversely affected by the time Caplan was taking off work to attend to her son's and her own medical conditions. (ECF No. 35 at 21; C.S. ¶¶ D82-83, ¶¶ P101, P107-09, P112-19.)  The first flaw in this theory is that Courtney did not participate in the decision to terminate Caplan. (C.S. ¶¶ D40-48, ¶ P70.)  Caplan's restructuring or recharacterization of her days off work could not have protected her job because Courtney did not participate in the decision to terminate her.  Putting this dispositive fact aside, Caplan

proffers no evidence to permit a reasonable jury to conclude that Courtney would not have been angry that Caplan was missing work if Caplan's days were designated as FMLA leave, instead of PTO. Such a finding would be illogical when considered in the context of Caplan's own theory of the case, i.e., that Courtney was antagonistic because the performance of Caplan's stores was being adversely affected by Caplan missing too many days of work during a busy time of year. Caplan fails to proffer evidence explaining how the classification of Caplan's absences as FMLA days instead of PTO days would have eliminated Courtney's purported antagonism.

The record is devoid of any evidence from which a reasonable jury could reach the conclusion that Caplan was deprived of benefits to which she was entitled under the FMLA, even assuming for purposes of the present motion that VSS failed to provide her the notice required under the FMLA. For these reasons, Caplan fails to proffer sufficient evidence to establish the fifth element of a prima facie FMLA interference case, making entry of judgment as a matter of law in VSS's favor on this claim appropriate. VSS's motion for summary judgment on Count II is granted.

### 2. FMLA Retaliation (Count III)

In Count III of her complaint, Caplan asserts a claim for FMLA retaliation. To establish a prima facie case of retaliation under the FMLA, an employee must prove that "(1) she invoked her right to FMLA-qualifying leave, (2) she suffered an adverse employment decision, and (3) the adverse action was causally related to her invocation of rights." Lichtenstein, 691 F.3d at 301-02 (citing Erdman v. Nationwide Ins. Co., 582 F.3d 500, 508-09 (3d Cir. 2009)). The burden-shifting framework established in McDonnell Douglas Corporation v. Green, 411 U.S. 792 (1973), applies to retaliation claims arising under the FMLA. Lichtenstein, 691 F.3d at 302. Therefore, if a prima facie case is established, then the employer must articulate a legitimate,

nonretaliatory reason for the adverse employment action. Ross v. Gilhuly, 755 F.3d 185, 193 (3d Cir. 2014). If the employer offers such a reason for its action, then the employee must present evidence proving that the reason is a pretext for retaliation. Id. Here, when viewing the facts in the light most favorable to Caplan, she is unable to establish a prima facie case of FMLA retaliation because there is no causal connection between the time she took off work in 2014 and her termination.

The ultimate question with respect to causation in an FMLA retaliation case is whether FMLA-qualifying leave was a "negative factor" that hastened a plaintiff's termination. Lichtenstein, 691 F.3d at 311 (citing 29 C.F.R. § 825.220(c)). Evidence that the temporal proximity between the employee's protected activity and the alleged retaliatory action is unusually or unduly suggestive of retaliatory motive can satisfy the causal link requirement. Farrell v. Planters Lifesavers Co., 206 F.3d 271, 280-81 (3d Cir. 2001). Where the temporal proximity is not sufficient to imply direct causation, evidence of a pattern of ongoing antagonism or an employer's inconsistent reasons for terminating an employee may satisfy the third element of the prima facie case. Id.; Blakney v. City of Phila., 559 F.App'x 183, 186 (3d Cir. 2014); Abramson v. Wm. Patterson College of N.J., 260 F.3d 265, 288 (3d Cir. 2001). Caplan fails to produce sufficient evidence to allow a reasonable jury to find a causal connection on any basis.

### (a)    Temporal Proximity

Caplan contends that she can establish causation because she was terminated ten days after she returned to work following her last day of PTO. (ECF No. 35 at 22-23.) Close temporal proximity may be sufficient to establish causation for purposes of establishing a prima face case. Lupyan, 761 F.3d at 325; Lichtenstein, 691 F.3d at 307. There is no dispute that Caplan returned to work on June 10, 2014, and was terminated on June 19, 2014, which is a period of ten days.

(C.S. ¶¶ D52, D61, ¶ P123.)  Caplan's termination ten days after returning to work from her last day of PTO could be considered unduly suggestive of retaliatory motive.[8] Lichtenstein, 691 F.3d at 307 (period of seven days deemed sufficient to establish causation); Shellenberger v. Summit Bancorp, Inc., 318 F.3d 183, 189 (3d Cir. 2003) (ten days deemed unduly suggestive); Farrell, 206 F.3d at 280 (temporal proximity greater than ten days requires supplementary evidence of retaliatory motive); Sowell v. Kelly Services, Inc., 139 F.Supp.3d 684, 695 (E.D. Pa. 2015) (seven days is "within the realm of what courts have found to be sufficient to establish a prima facie case").

Even if temporal proximity is unusually suggestive of retaliatory motive, however, the "degree of suggestiveness of the time span depends on the particular facts of the situation." Mascioli, 610 F.Supp.2d at 437.  The suggestiveness of temporal proximity can be diminished by the circumstances surrounding termination. Mascioli, 610 F.Supp.2d at 437 (citing Zelinski v. Pa. State Police, 108 F.App'x 700, 706 (3d Cir. 2004)).  The suggestiveness of the temporal proximity between Caplan's PTO and her termination is diminished in this case because Caplan's termination is even more proximate to VSS's receipt of an ethics complaint about her.

---

[8] There is some suggestion in recent case law that temporal proximity should be measured from the first date on which an employee engaged in protected activity, or in this case, April 22, 2014, when Caplan required time off due to her son's broken wrist. (ECF No. 38-3 at 1; C.S. ¶¶ P92-93); Blakney, 559 F.App'x at 186 (citing Jalil v. Avdel Corp., 873 F.2d 701, 708 (3d Cir. 1989)); Capps v. Mondelez Global LLC, 147 F.Supp.3d 327, 337 (E.D. Pa. 2015); Conner v. Ass'n of Flight Attendants, No. 13-2426, 2014 WL 6973298, at *4 (E.D. Pa., Dec. 10, 2014).  These decisions, however, were not issued in cases where, as here, an employee took repeated, consecutive periods of medical leave, and was terminated soon after returning to work after the last period of leave was taken.  Under such circumstances, a reasonable jury could find that the employer was not antagonistic toward the employee for taking the initial or next period of leave, but eventually developed antagonism, and a retaliatory motive, after the employee continued to request additional periods of leave.  The court, however, need not resolve this legal issue and will presume for purposes of the pending motion that temporal proximity should be measured from the last date on which Caplan took PTO, or June 9, 2014.

Caplan was terminated two days after VSS received an ethics complaint about her, one day after members of VSS's human resources and legal departments conferred and decided that Caplan would be automatically terminated if she admitted to certain of the reported misconduct, and the same day that Caplan admitted to making the two Facebook posts identified in the ethics complaint. (C.S. ¶¶ D40-46, D52, D56, D60-61, ¶¶ P13, P16.)  Caplan does not dispute that VSS received a complaint about her through the Ethics Hotline on June 17, 2014. (C.S. ¶ D28, ¶¶ P5, P50.)  Although Caplan contends that the complaint may have been made by a coworker with a grudge against her, the motivation behind the complaint is inapposite. (C.S. ¶¶ P54-55.)   The following facts are undisputed: a) VSS received the ethics complaint, b) VSS located the two Facebook posts mentioned in that complaint, c) all VSS officials consulted about the posts found them to reflect badly on VSS, violate VSS policy, and warrant immediate termination, and d) Caplan admitted to making both Facebook posts.  These intervening events make the time span between Caplan's PTO and her termination less suggestive under the circumstances of this case, regardless whether the time span begins on April 22, 2014, or June 10, 2014.

Even if the suggestiveness created by the temporal proximity in this case was not diminished by these circumstances, Caplan's FMLA retaliation claim suffers from a more fundamental flaw.  In order for Caplan to rely upon temporal proximity to prove the third element of her prima facie case, she must produce evidence sufficient to allow a reasonable jury to find that the decisionmakers knew about her FMLA-protected activities. McElroy v. Sands Casino, 593 F.App'x 113, 116 (3d Cir. 2014) (citing Moore, 461 F.3d at 351).  The record directly contradicts such a finding.

The ultimate decisionmaker was Williams, who consulted with Stalter, McBride, and Sheets on June 18, 2014, about the ethics complaint and the circumstances under which Caplan would be terminated. (C.S. ¶¶ D40, D42, D48.)  This group agreed that the Facebook posts were racially offensive, violated VSS policies, and could reflect poorly on VSS because Caplan identified herself on her Facebook profile as a VSS manager. (C.S. ¶¶ D43-44.)  Although Williams made the final decision, all members of the group agreed that Caplan should be terminated with severance pay if she admitted to making the Facebook posts. (C.S. ¶¶ D42, D46.)  Caplan produces no evidence that any member of this group had any knowledge that Caplan needed to take time off work in 2014 or actually took PTO in 2014, or that her son or she had health problems around that time. (C.S. ¶ D77[9].)  Based upon this record, no reasonable jury could find that the officials involved in making the decision to terminate her, i.e., Williams, Stalter, McBride, and Sheets, knew about her FMLA-protected activities.

Although it is undisputed that Courtney and Martinez knew about Caplan's PTO, Caplan admits that these two individuals were not involved in the decision to terminate her and did not participate in the meetings leading up to that decision on June 18, 2014. (C.S. ¶¶ D41-42, D51, ¶ P70.)  Courtney was not aware of the ethics complaint until after the decision had been made to terminate Caplan if she admitted to certain of the allegations made in that complaint. (C.S. ¶¶ D50-51.)  Under the circumstances, even if they are assumed to be true for purposes of deciding the instant motion, the purported statements that Courtney made to Caplan about taking PTO "at her own risk" during a busy time of the year, and about the subpar performance of the stores in

---

[9] On numerous occasions in the Concise Statement Caplan admits that an individual or group of individuals did, said, knew, or did not know something, but then disputes that "Defendant" did, said, knew, or did not know the same thing. See, e.g. C.S. ¶¶ D33, D35, D77.  Plaintiff cites to no evidence in support of her latter denials, and does not explain the distinction she is trying to make between the individual and the "Defendant."  Regardless of Caplan's intent, she cannot avoid summary judgment by attempting to create genuine issues of material facts in this manner.

Caplan's district are inconsequential. (ECF No. 30-1 at 95-97; ECF No. 35 at 21; C.S. ¶¶ P107-09, P112-20).  Because Courtney did not participate in the decision to terminate Caplan, Courtney's purported hostility about Caplan needing or taking time off work could not have affected VSS's decision to terminate Caplan's employment.

For all the foregoing reasons, Caplan cannot establish the third element of her <u>prima</u> <u>facie</u> FMLA retaliation claim based upon temporal proximity.

> **(b)** **<u>Ongoing Antagonism</u>**

Caplan can rely upon "other evidence" to establish causation, such as that VSS engaged in a pattern of ongoing antagonism in the time between her protected activity and her termination. <u>Blakney</u>, 559 F.App'x at 186 (citing <u>Robinson v. Se. Pa. Transp. Auth.</u>, 982 F.2d 892, 894 (3d Cir. 1993)).  Caplan does not explicitly argue in opposition to VSS's motion for summary judgment that she can establish a pattern of ongoing antagonism. (ECF No. 35 at 22-23).  In opposition to VSS's motion for judgment as a matter of law on her FMLA retaliation claim, Caplan makes an argument about temporal proximity, and then incorporates by reference the arguments she made in opposition to VSS's motion for summary judgment on her § 1981 retaliation claim. (<u>Id.</u> at 23.)  According to Caplan, "this circumstantial evidence establish[es] causation [and] creates an inference of pretext" for her FMLA retaliation claim. (<u>Id.</u>)

All the circumstantial evidence that Caplan incorporates by reference concerns the manner in which VSS investigated and disposed of the June 17, 2014 ethics complaint.  Caplan was terminated two days after this complaint was made.  How VSS handled a single ethics complaint over approximately 48 hours cannot establish a pattern of antagonism against her. Caplan makes no effort to argue that it could.

The only other evidence in the record reflecting any pattern of conduct between VSS and Caplan are the communications between Courtney and Caplan about Caplan's and her son's health conditions, and about the performance of the stores in Caplan's district. Although Caplan does not argue in opposition to VSS's motion for summary judgment that these interactions establish a pattern of antagonism against her, the court will nonetheless evaluate them in an effort to determine whether they could possibly support Caplan's prima facie case. Even viewing the facts in the light most favorable to Caplan, the court concludes that they cannot.

As an initial matter, as set forth in detail earlier in this opinion, it is undisputed that Courtney was not involved in the decision to terminate Caplan. (C.S. ¶¶ D41-42, D50-51, ¶ P70.) Even if Caplan could prove that Courtney engaged in a pattern of antagonism against her because she took PTO in 2014, it would be impossible for Caplan to establish the required causal link between Courtney's antagonism and Caplan's termination. Even though this is fatal to any contention that the communications between Courtney and Caplan in 2014 establish a pattern of antagonism that is probative of causation, the court will proceed with the analysis.

Courtney communicated with Caplan each time Caplan needed PTO, as required under VSS policy in order for Caplan to obtain PTO. (C.S. ¶ D70.) The record reflects that Caplan's requests for PTO were typically made on the morning of or the night before the day that she needed to take off because health issues had suddenly arisen with her son or with Caplan herself. (e.g., ECF No. 38-3 at 1, 3, 4, 5, 7, 14.) At times Courtney would follow up with Caplan to see how her son or she was feeling or to ask whether Caplan would be reporting to work, or participating in conference calls on a particular day. (ECF No. 38-3 at 6, 8, 15, 20.) Despite the fact that the email communications between Caplan and Courtney are consistently innocuous, and in fact reflect Courtney's concern and support, Caplan contends that they made her feel that

Courtney was opposed to her taking PTO. (C.S. ¶¶ P116-17.)  Caplan points specifically to an email exchange in which Courtney states that she was trying to "respect her health concerns and not bother [her] too much" and a group email about store performance that Courtney sent to Caplan, along with her other district managers, even though Courtney knew that Caplan was off work on that particular day. (ECF No. 38-3 at 18; C.S. ¶¶ P101, P115.)

No reasonable jury could conclude based upon these email exchanges that VSS engaged in a pattern of antagonism against Caplan between the time that she took PTO and her termination.  There is no indication in Courtney's inquiries about Caplan's son's medical conditions or Caplan's own medical conditions of harassment or hostility.  To the extent any of the email communications raise issues or concerns with store performance they either were initiated by Caplan, ECF No. 38-3 at 20, directed to all district managers in Courtney's region and not targeted at Caplan, ECF No. 38-3 at 11, or sought necessary data from Caplan about the stores in her district, ECF No. 38-3 at 21. (C.S. ¶¶ P101, P112-13.)  No reasonable jury could conclude that these routine, business-related communications with a management-level employee who unexpectedly required time off from work are probative of a pattern of ongoing antagonism against that employee.

Caplan, however, suggests that Courtney verbally warned her about taking too much time off during two telephone conversations in June 2014. (C.S. ¶¶ P107-09.)  This kind of verbal harassment, if it exists, could be indicative of a pattern of antagonism.  In this case, however, no reasonable jury could conclude that Caplan established a pattern of antagonism based upon conversations that she had with Courtney.  As an initial matter, Caplan testified at her deposition about only a single telephone conversation that she had with Courtney in which Courtney allegedly warned her that she was taking PTO "at her own risk" because it was a busy time of the

year and told her that other employees were noticing her absences. (ECF No. 38-1 at 28-29

(depo. pgs. 250/5-12, 251/7-24, 252/4-13, 253/10-17); C.S. ¶¶ P107-09.)  There is no evidence in

the summary judgment record that Courtney spoke to Caplan via telephone more than once about

the time she was taking off in 2014.  Even accepting Caplan's version of the facts as true, a

single telephone conversation cannot establish a pattern of ongoing antagonism.

The record would not support an inference of causation based upon a pattern of

antagonism against Caplan.

### (c)  Inconsistent Reasons

Caplan could also establish the requisite causal link by producing evidence that VSS

gave inconsistent reasons for her termination. Blakney, 559 F.App'x at 186 (citing Farrell, 206

F.3d at 280-81).  Again, Caplan does not explicitly argue in opposition to VSS's motion for

summary judgment that she can prove causation with this kind of evidence, but asserts that the

"circumstantial evidence" she proffers in opposition to VSS's motion for summary judgment on

her § 1981 retaliation claim establishes causation. (ECF No. 35 at 22-23).   As set forth above, all

this circumstantial evidence concerns the manner in which VSS investigated and disposed of the

June 17, 2014 ethics complaint against her.  Although Caplan challenges the manner in which

VSS conducted its investigation, and claims that VSS reached the wrong conclusion, Caplan

never contends that VSS offered conflicting or inconsistent reasons for why she was being

terminated.  The record contains only one reason for Caplan's termination; she admitted to

making what VSS officials uniformly agreed were racially offensive and derogatory posts on her

Facebook page.

The record would not support an inference of causation based upon inconsistent reasons

for terminating Caplan.

**(d)  Summary**

For all the foregoing reasons, Caplan cannot establish the third element of her <u>prima</u> <u>facie</u> FMLA retaliation claim.  Caplan fails to present evidence sufficient to permit a reasonable jury to find that there was a causal connection between her need for and taking of PTO in 2014 and her termination.  Caplan, therefore, cannot establish a <u>prima</u> <u>facie</u> case of FMLA retaliation and VSS is entitled to judgment as a matter of law on that claim.  VSS's motion for summary judgment on Count III of Caplan's complaint is granted.

**C.  Pretext Analysis**

Although the court concludes that Caplan failed to proffer sufficient evidence to establish a <u>prima</u> <u>facie</u> case of retaliation under either § 1981 (Count I) or the FMLA (Count III), the court will consider Caplan's evidence of pretext in the interest of completeness.  That evidence, however, does not change the court's ultimate ruling because it is not sufficient to permit a reasonable jury to conclude that VSS's proffered reason for terminating Caplan was a pretext for retaliation.

Both of Caplan's retaliation-based claims follow the <u>McDonnell Douglas</u> burden-shifting framework. <u>Lichtenstein</u>, 691 F.3d at 302; <u>Sarullo v. United States Postal Serv.</u>, 352 F.3d 789, 797 (3d Cir. 2003).  Under that framework, if an employee establishes a <u>prima</u> <u>facie</u> case of retaliation under § 1981 or the FMLA, then the employer must articulate a legitimate nonretaliatory reason for the adverse employment action. <u>Ross</u>, 755 F.3d at 193; <u>McElroy</u>, 593 F.App'x at 116.  If the employer does so, then the burden shifts back to the employee to prove by a preponderance of the evidence that the proffered reason is a pretext for retaliation. <u>Ross</u>, 755 F.3d at 193.

VSS's legitimate, nonretaliatory reason for terminating Caplan is her admission that she made the two Facebook posts at issue.  That reason is sufficient to meet VSS's burden.  Caplan argues that reason is a pretext for retaliation. (ECF No. 35 at 12-18, 23.)  To demonstrate pretext, an employee must either: (1) offer evidence that casts sufficient doubt upon the legitimate reason proffered by the defendant so that a fact-finder could reasonably conclude that the reason was a fabrication, or (2) present evidence sufficient to support an inference that discrimination was more likely than not a motivating or determinative factor in the termination decision. Fuentes v. Perskie, 32 F.3d 759, 762, 764 (3d Cir. 1994).  The two prongs of the Fuentes test are distinct and, where appropriate, are analyzed separately to determine whether sufficient evidence was presented to defeat a motion for summary judgment.

Prong one of the Fuentes test focuses on whether an employee submitted evidence from which a fact-finder could reasonably disbelieve the employer's articulated legitimate reasons for its employment decision.  Under this prong, the employee must point to "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence,' ...and hence infer 'that the employer did not act for [the asserted] non-[retaliatory] reasons.'" Fuentes, 32 F.3d at 765 (internal citations omitted).  An employee "cannot simply show that the employer's decision was wrong or mistaken." Fuentes, 32 F.3d at 765.  The fact that an employer made a bad decision does not make that decision retaliatory; an employer can have any reason or no reason for its employment action, so long as it is not a retaliatory reason. See Brewer v. Quaker State Oil Ref. Corp., 72 F.3d 326, 332 (3d Cir. 1995).  The question at prong one of the Fuentes test "is not whether the employer made the best, or even a sound, business decision;" it is whether the real reason for the employment decisions is retaliation.

Keller v. ORIX Credit Alliance, Inc., 130 F.3d 1101, 1109 (3d Cir. 1997). Evidence undermining an employer's proffered legitimate reasons must be sufficient to "support an inference that the employer did not act for its stated reasons." Sempier v. Johnson & Higgins, 45 F.3d 724, 731 (3d Cir. 1995).

Prong two of the Fuentes test permits an employee to survive summary judgment if she can demonstrate that retaliation "was more likely than not a motivating or determinative cause of the adverse employment action." Fuentes, 32 F.3d at 762. The kinds of evidence relied upon by the Court of Appeals for the Third Circuit under this prong of the Fuentes test are: 1) whether the employer previously retaliated against the plaintiff; 2) whether the employer has retaliated against other persons; and 3) whether the employer has previously treated more favorably similarly situated persons who did not engage in the protected activity at issue. See Simpson, 142 F.3d at 644-45.

Caplan contends that the following evidence establishes pretext under the facts of this case: (1) Caplan's termination contradicts VSS's anti-discrimination policies, which encourage employees to "speak up" against discrimination; (2) the investigation of the ethics complaint against Caplan violated VSS's internal policies and procedures; (3) VSS found the person filing an anonymous complaint to be more credible than Caplan; (4) VSS took race into account in determining whether the Airwrecka McBride post was racially offensive; and (5) VSS offered Caplan a severance package even though it claims that her conduct was egregious. (ECF No. 35 at 12-18.) Although not explicitly stated by either party, all this evidence is directed to the first prong of the Fuentes test. The court concludes that Caplan fails to meet her burden to submit sufficient evidence from which a fact-finder could reasonably find that VSS's articulated legitimate, nonretaliatory reason for terminating her is so implausible, weak, and incoherent that

it is unworthy of credence, and that retaliation, whether for Caplan's opposition to racism or for taking or needing time off work in 2014, was more likely than not a motivating or determinative factor in the decision to terminate her employment.[10]

### 1. *Fuentes* Test: Prong One

As set forth above, Caplan identifies several facts or circumstances surrounding how the ethics complaint against her was handled as probative that VSS's reason for terminating her is not worthy of belief. (ECF No. 35 at 12-18.)  The court will consider each of these facts and circumstances below, but in summary concludes that none, either alone or in combination, provides sufficient evidence to support a reasonable jury finding that VSS's legitimate, nonretaliatory reason is unworthy of belief, and to permit an inference that the real reason Caplan was terminated was because she opposed racism or took or needed time off work.

### a) Violation of VSS's Anti-Discrimination Policy

According to Caplan, a reasonable jury could not believe VSS's proffered reason for her termination because VSS policies encourage employees to "speak up" against racism; yet, she was terminated because she opposed racism. (ECF No. 35 at 13.)  Caplan relies upon Williams' testimony purportedly about there being acceptable and unacceptable ways to oppose discrimination in the workplace to support her argument that she was terminated because she opposed racism in "the wrong way." (Id.)  The entire argument rests, however, upon the premise that Caplan's post on Facebook that depicted an unidentified person in a white, hooded robe was a protest against racial discrimination. (Id.)  This court concluded, in section IV.A., however, that this picture did not objectively convey a protest against racial discrimination.  The court

---

[10] Some of Caplan's pretext evidence would only support her § 1981 retaliation claim because it allegedly proves retaliatory motive based upon Caplan's opposition to racism, e.g., item 1 and item 4.  Because the court concludes that none of this evidence, either alone or in combination, is sufficient for a reasonable jury to find pretext, the court need not further consider this distinction.

reached the same conclusion about the other post Caplan made on Facebook, even though Caplan does not rely upon that post as evidence of pretext in this portion of her opposition brief. (ECF No. 35 at 12-13.) Those conclusions are fatal to Caplan's present argument.

There is no dispute in the record that Williams, and the individuals with whom he consulted about the ethics complaint, agreed that both Facebook posts were racially derogatory and offensive and alone justified Caplan's termination if Caplan admitted to making them. (C.S. ¶¶ D43-46, D57, D59.) Caplan's insistence that she intended the posts to be a protest against racism and that the posts were not "actually offensive" are inapposite. (C.S. ¶ D57, D59 (Caplan's responses).) What matters is the perception of the decisionmaker, not the intent or personal opinion of the employee; the question, after all, is whether the employer acted with a retaliatory motive instead of its proffered motive in making its employment decision. Paradoa v. Phila. Housing Auth., No. 13-6012, 2014 WL 2476595, at *8 (E.D. Pa. June 2, 2014). Even if Williams', and the others', belief was wrong, ill-informed, or mistaken, if it was genuine, honestly-held, and reasonable it cannot qualify as evidence of pretext. Id. at *8 (citing decisions); Jackson v. Bob Evans-Columbus, No. 04-559, 2006 WL 3814099, at *10 (W.D Pa. Dec. 22, 2006) (collecting decisions). The record is devoid of any evidence that these VSS officials did not genuinely and honestly believe that the Facebook posts at issue, which included imagery associated with the Ku Klux Klan and a satire about how an African-American woman spelled her name, were racially offensive and derogatory. Their belief is not so outlandish that a reasonable jury could reject it outright, without any independent evidence that it was held in bad faith. Caplan's bald assertion that it is "preposterous [that] she would be fired" for posting these items on Facebook is not alone sufficient to establish pretext. (C.S. ¶ D82 (Caplan's response).) Caplan produces no evidence from which a reasonable jury could find that the VSS officials

fabricated their beliefs in order to conceal their true motivation, i.e., retaliating against Caplan for opposing racism or taking or needing time off work in 2014.

Instead of attacking the genuineness of the VSS officials' beliefs, Caplan insists that the VSS officials' beliefs were wrong. Caplan cannot prevail at trial by proving that VSS was wrong about the nature of her statements. <u>Fuentes</u>, 32 F.3d at 765. Caplan must prove that VSS retaliated against her, not that it made an incorrect or bad business decision. <u>Abramson</u>, 260 F.3d at 283.

Despite Caplan's contention, she produces no evidence that VSS violated its own anti-discrimination policies by deciding to terminate her. Caplan's entire argument rests upon the premise that Williams, and the others with whom he consulted, reached the wrong conclusion about the intent and meaning behind the two Facebook posts at issue. Even if Caplan is correct, however, under prevailing legal authorities, this is not probative of pretext.

### b) <u>Failure to Follow VSS Procedures</u>

Caplan contends that the manner in which VSS investigated the June 17, 2014 ethics complaint against her is evidence of pretext. (ECF No. 35 at 13-14.) Specifically, Caplan faults VSS for not speaking to her, Courtney, or her coworkers before deciding to terminate her employment, as purportedly dictated by VSS policies and procedures. (<u>Id.</u>) This evidence, according to Caplan, shows that VSS terminated her in retaliation for opposing racism or taking or needing time off work in 2014. The facts and the law do not support Caplan's argument.

As an initial matter, the deposition testimony to which Caplan cites in connection with her assertion that VSS failed to follow its internal policies and procedures when it investigated the June 17, 2014 ethics complaint against her does not support her contention. (ECF No. 35 at 14 (citing C.S. ¶¶ P62-64).) None of the cited testimony concerns policies, procedures, or

hypothetical situations in which a VSS manager posted racially derogatory and offensive images on his or her Facebook page.

The first two deposition exchanges of Williams and Martinez to which Caplan cites concern hypothetical instances in which a VSS employee observes racism or discrimination at work and discloses the situation on his or her Facebook page, rather than reporting it to a supervisor or management. (C.S. ¶ P62 (citing ECF No. 38-2 at 5-6 (depo. pgs. 31-32) and at 40-41 (depo. pgs. 96-97).)  Caplan is not accused in this case of disclosing racism or discrimination occurring at VSS on her Facebook page, making any policies or procedures triggered by these hypothetical situations inapposite.

Caplan cites to the deposition of Martinez as purportedly establishing that it is VSS's policy to "ask additional questions" and "seek to understand the context of a remark" if a manager posts something on social media accusing an employee at another company of being a racist. (C.S. ¶ P63 (citing ECF No. 38-2 at 42 (depo. pg. 101).)  Martinez, however, does not testify that this constitutes VSS's policy.  Martinez was responding to a hypothetical question about the higher standard to which managers are held and whether "calling out discrimination when you see it" meets that standard. (Id.)  The only practice or policy reflected in Martinez's testimony is that the human resources department contacts VSS's legal department about complaints of discrimination that are made on-line because the legal department is the decisionmaker in such situations. (ECF No. 38-2 at 41 (depo. pgs. 97/7-9, 98/12-14, 99/9-10, 14-15).)  This is precisely what the undisputed record reflects happened in this case with respect to the ethics complaint that was made about Caplan.

The final deposition excerpt relied upon by Caplan to support her contention that VSS had standard policies and procedures when investigating on-line allegations of racism actually concerns attempts by VSS employees to unionize. (C.S. ¶ P64 (citing ECF No. 38-2 at 12 (depo. pg. 79).) Although the ethics complaint included allegations against Caplan along these lines, there is no evidence that Caplan was terminated because she attempted to unionize the VSS workforce.

The record upon which Caplan relies does not reflect that VSS had any standard policy or procedure about how to investigate the ethics complaint that was made about Caplan. Putting this evidentiary defect in Caplan's argument aside, and viewing the evidence in the light most favorable to her, Caplan's pretext argument is nevertheless not supported by the evidence. The ethics complaint included accusations other than that Caplan made the two Facebook posts at issue. The complaint also accused Caplan of refusing to hire or promote minority candidates, making racist remarks, including using the "N word," and talking about unions at work. (C.S. ¶ D28.) There is no dispute that Williams, and the other VSS employees with whom he consulted on June 18, 2014, decided that if Caplan admitted to making any of the alleged racist remarks or to making either of the Facebook posts, then she would be terminated. (C.S. ¶¶ D42, D46.) There is no dispute that the VSS officials also agreed that if Caplan denied engaging in either activity, then "they would further investigate" the complaint. (C.S. ¶ D42.) In other words, Williams decided to phase VSS's investigation of the ethics complaint based upon whether Caplan admitted to engaging in certain of the conduct alleged in it. There is no dispute that when Caplan was confronted with the allegations made in the ethics complaint, she admitted to making the two Facebook posts. (C.S. ¶ D56.) Under the version of the facts with which Caplan agrees, the need for VSS to conduct any further investigation into the remaining allegations of

the ethics complaint was eliminated because she admitted to making the two posts on Facebook. VSS's failure to "connect with" Caplan or her supervisor or coworkers in order to "understand the context of the remark" or "ask additional questions" cannot be probative of pretext under these circumstances. (C.S. ¶¶ P62-63.)

Even if the record supported Caplan's argument as a factual matter, it would fail as a matter of law. While evidence that an investigation was utterly foolish, biased, or unsubstantiated could be probative of a retaliatory motive, proof that it was imperfect, unwise, or inaccurate would not. Fuentes, 32 F.3d at 765 n.8; Kariotis v. Navistar Int'l Transp. Corp., 131 F.3d 672, 677 (7th Cir. 1997). A challenge to the sufficiency or propriety of the investigation is inadequate to establish pretext. Money v. Provident Mut. Life Ins. Co., 189 F.App'x 114, 116–17 (3d Cir. 2006) (finding plaintiff's "naked credibility attack" on the adequacy of an investigation insufficient to establish pretext); Geddis v. Univ. of Delaware, 40 F.App'x 650, 653 (3d Cir. 2002) (finding that a lack of investigation is not sufficient to show an employer acted with discriminatory animus); Epps v. First Energy Nuclear Operating Co., No. 11-1462, 2013 WL 1216858, at *29 (W.D. Pa. Mar. 25, 2013) ("It is well-recognized that the fact that a company conducted an inadequate investigation of employee misconduct or failed to interview an employee during an internal investigation, without more, is not sufficient to raise an inference of discrimination"); Glenn v. Raymour and Flanigan, 832 F.Supp.2d 539, 553 (E.D. Pa. 2011) (allegation that employer should have interviewed more witnesses is not evidence of pretext); Thomas v. Fairmount Behavioral Health Sys., No. 06-523, 2007 WL 2306592, at *6 (E.D. Pa. Aug. 9, 2007) (finding insufficient evidence to establish pretext after considering plaintiff's argument that a "diligent investigation" did not occur); Reynolds v. Metro. Life Ins. Co., No. 04-232, 2007 WL 603012, at *6 (W.D. Pa. Feb. 22, 2007) (finding that "[e]ven if [defendant]

conducted a flawed investigation ... there is no indication that it was pretext for age discrimination"). The only evidence proffered by Caplan in support of her argument on this point is that VSS failed to speak to her, her supervisor, or her coworkers before deciding to terminate her employment, and never looked into the accusation that she spoke about unionizing the workforce. (ECF No. 35 at 14.)  Under the legal authorities cited immediately above, however, this kind of challenge cannot be probative of pretext.

Caplan proffers no evidence establishing that VSS's investigation of the ethics complaint was so specious that a reasonable jury could draw the inference that it was pretextual.  As was summarized immediately above, VSS human resources employees located the Facebook posts mentioned in the ethics complaint on Caplan's Facebook profile and shared them with VSS legal department officials, all of whom agreed that the posts were racially offensive, violated various VSS policies, and were sufficient, standing alone, to justify termination if Caplan admitted to being the person responsible for posting them. (C.S. ¶¶ D30, D33-39, D42, D46.)  The amount of investigation needed to arrive at this strategy was minimal.  Under the circumstances, Caplan's contention that the investigation was a sham because of its limited duration and scope is misplaced.  There is no dispute that VSS intended to continue its investigation into the remaining accusations made in the ethics complaint if Caplan denied using racial epithets or making the Facebook posts.  (C.S. ¶ D46.)  The second phase of the investigation became unnecessary, however, when Caplan admitted to making the Facebook posts.  VSS's failure to engage in the next phase of the investigation, therefore, cannot be probative of pretext.

There is no evidence from which a reasonable jury could infer from the manner in which VSS investigated the ethics complaint that VSS was motivated by retaliatory animus instead of Caplan's misconduct. Caplan's burden is to prove that VSS retaliated against her, not that it did a bad job of investigating the ethics complaint. <u>Abramson</u>, 260 F.3d at 283.

### c) **Credibility of Anonymous Reporter**

According to Caplan, VSS's reason for terminating her is not worthy of belief because VSS credited the individual who made the anonymous ethics complaint instead of her. (ECF No. 35 at 15-16.) In support of this argument, Caplan cites Williams' deposition testimony about whether, and why, he believed the various allegations made in the ethics complaint about Caplan being a racist. (<u>Id.</u>) Aside from being legally irrelevant because it is another attack on the sufficiency and effectiveness of VSS's investigation, and the accuracy of the VSS's officials' beliefs, this allegation is factually inapposite. Caplan was not terminated because VSS determined that she refused to promote minority employees or made racist comments at work, as the anonymous reporter claimed in the ethics complaint. She was terminated because she made the two Facebook posts at issue, which VSS deemed sufficient to warrant immediate termination. VSS obtained copies of those two posts from Caplan's Facebook profile, and Caplan admitted that she made them.

The credibility of the individual who made the ethics complaint against Caplan was irrelevant to VSS's employment decision under the circumstances. Thus, VSS's purported incorrect decision to believe the person who made the ethics complaint instead of Caplan cannot be evidence that VSS acted with retaliatory intent when it terminated her employment.

**d) VSS Considered Race**

Caplan contends that VSS's proffered reason for terminating her is "weak, implausible, inconsistent, and contradictory" because VSS took race into consideration when it made its decision. (ECF No. 25 at 16-17.) Although Caplan's argument is somewhat convoluted, she appears to assert that a reasonable jury could disbelieve that Caplan was terminated for making racially offensive posts because Williams, Martinez, and Courtney are themselves racists. According to Caplan, the evidence establishes that these three VSS employees are racists because they concluded that the Airwrecka post was offensive only because the woman depicted in it was African-American.

The first problem with this argument is that, as set forth above in section IV.B.2, neither Martinez nor Courtney were involved in the decision to terminate Caplan. According to Caplan's own argument, their racism, even if it existed, could have had no effect on the adverse employment action that VSS took against her, and cannot act as proof that VSS's reason for terminating her was a pretext for retaliation.

The second problem with Caplan's argument is that a reasonable inference cannot be drawn that VSS retaliated against Caplan for opposing racism from the fact that Williams concluded that the Airwrecka post was offensive due to the race of the woman pictured in it. The undisputed record reflects that Stalter, McBride, and Sheets all agreed that the Airwrecka post was racially offensive because it drew upon stereotypes about the spelling of African-American names. Even if all four VSS officials were wrong, ill-informed, or irresponsible in reaching that conclusion, Caplan identifies no evidence that their conclusion was not honestly reached and held in good faith. Paradoa, 2014 WL 2476595, at *8; Jackson, 2006 WL 3814099, at *10. Caplan proffers no other evidence that could support a reasonable jury finding that VSS

fabricated its reasons for terminating her to conceal the fact that VSS favors racism and racist employees, and retaliates against employees who oppose racism.  Such a finding would be wholly unsupported by the record, illogical, and unsound.

### e) <u>Severance Package Offered</u>

Caplan's last piece of evidence in support of her contention that a reasonable jury could disbelieve VSS's proffered reason for her termination is that she was offered a severance package even though VSS considered her misconduct to be "egregious." (ECF No. 35 at 17-18.) According to the very evidence upon which Caplan relies, however, under VSS policy, any employee involuntarily terminated for misconduct is eligible for a severance package depending upon the nature of the misconduct. (C.S. ¶ P76.)  The undisputed evidence reflects that Williams decided that Caplan would be entitled to no severance if she admitted to using racial slurs, but would be paid reduced severance if she only admitted to making the Facebook posts. (C.S. ¶ D46.)  The record establishes that VSS acted in accordance with its policy to consider the character and severity of the misconduct in awarding severance to terminated employees.

Caplan proffers no evidence that an employee is automatically disqualified from receiving a severance package if the misconduct is considered to be "egregious."  Contrary to Caplan's argument, therefore, the fact that she was offered a severance package is not inconsistent with VSS policy, and therefore, cannot establish that the real reason for her termination was retaliation.

In summary, none of the evidence submitted by Caplan would permit a reasonable jury to disbelieve VSS's articulated legitimate reason for terminating her.   The circumstances identified by Caplan do not constitute "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in VSS's explanation for her termination that a reasonable jury could find it

"unworthy of credence," and infer instead that VSS's actual reason for terminating her was retaliation, whether for opposing racism or taking or needing time off work in 2014. Caplan, therefore, cannot satisfy prong one of the <u>Fuentes</u> test.

## 2. *Fuentes* **Test: Prong Two**

Even though Caplan failed to produce evidence that would support a reasonable jury finding in her favor under the first prong of the <u>Fuentes</u> test, she can survive summary judgment if, under the second prong of the <u>Fuentes</u> test, she can demonstrate that retaliation "was more likely than not a motivating or determinative cause of the adverse employment action." <u>Fuentes</u>, 32 F.3d at 762. Caplan can do so by showing that: 1) VSS previously retaliated against her; 2) VSS retaliated against other persons; or 3) VSS previously treated more favorably similarly situated persons who did not oppose racial discrimination or take or need time off work. <u>Simpson</u>, 142 F.3d at 644–45. Caplan does not specifically address this second prong of the <u>Fuentes</u> test, or the kind of evidence to which it is directed. The court will nevertheless consider the record to determine whether Caplan's claim could possibly survive summary judgment under prong two of the <u>Fuentes</u> test. In doing so, the court reiterates that having failed to establish a <u>prima</u> <u>facie</u> case of retaliation under either § 1981 or the FMLA, the court does so only for purposes of the pending motion.

In this case, there is no evidence to support an inference that it is more likely than not that retaliation was the cause of Caplan's termination. The record is devoid of any evidence that VSS previously retaliated against Caplan. To the contrary, the record indicates that Caplan took medical leave several times between 2010 and 2012 and returned to work each time without incident. (C.S. ¶¶ D67, D74, ¶¶ P86-89.) There is no evidence in the record establishing that Caplan previously opposed racial discrimination and was retaliated against because of it.

Likewise, there is no evidence that VSS retaliated against any person other than Caplan or treated people who did not oppose racial discrimination or take or need time off work more favorably than it treated Caplan. There would be no basis for a reasonable jury to conclude that it is more likely than not that Caplan was terminated because she opposed racial discrimination or needed and took time off work in 2014.

### 3. Summary of Pretext Analysis

VSS asserts that it terminated Caplan's employment because she admitted that she made the two posts at issue on her Facebook profile, which posts VSS human resources and legal department officials uniformly determined were racially offensive, violated VSS policy, and warranted immediate dismissal. Caplan contends that she was actually terminated because she expressed opposition to racial discrimination in the workplace, and society in general, and took and needed time off work to attend to the medical conditions of her son and herself in 2014.

The ultimate question before this court is whether Caplan produced evidence from which a reasonable juror could conclude that VSS terminated her not because of the Facebook posts, but because of her opposition to racial discrimination and need to take time off work. The record is devoid of any evidence from which a reasonable jury could reach this conclusion. The circumstances relied upon by Caplan do not render VSS's explanation for her termination unworthy of belief or support an inference that the explanation was a fabrication developed to conceal VSS's retaliatory motives. The record is likewise devoid of any other evidence from which a fact-finder could reasonably conclude that retaliation was more likely than not a motivating or determinative cause of VSS's decision to terminate her.

## V. CONCLUSION

Based upon the foregoing analysis, judgment as a matter of law will be entered in favor of VSS with respect to all claims contained in Caplan's complaint. Accordingly, VSS's motion for summary judgment (ECF No. 28) is granted in its entirety.

An appropriate order will be entered.

Dated: September 28, 2016

BY THE COURT:

*/s/ Joy Flowers Conti*
Joy Flowers Conti
Chief United States District Judge